Good morning, ladies and gentlemen. Good morning, Judge Roedner. Good morning, Judge Taney. Good morning, Judge Durkin. Good morning, courtroom. Judge Roedner will be with us obviously by video, and we'll move to the first case this morning, Mimms v. CVS Pharmacy. May it please the Court. Alice McKenzie-Moricle for Appellant, CVS Pharmacy. CVS appeals the denial of summary judgment and the entry of judgment following a jury trial in this case. I will first speak to the summary judgment error and then turn to the trial error. The trial court improperly imputed knowledge of a corporate representative in Rhode Island to four speakers in Indiana to find actual malice and deny summary judgment. Imputation has never been applied by an Indiana court to a defamation case like this, and it has not been applied in a federal case either. The Sixth Circuit in Holbrook expressly rejected imputation to find actual malice, and imputation conflicts with Indiana law on what needs to be shown for a defamation case. Indiana is one of the few states that requires actual malice to be shown on a matter of public concern such as this issue before the Court. That meant that the plaintiff, Dr. Mimms, needed to prove actual malice of the speaker by clear and convincing evidence. The U.S. Supreme Court in the New York Times case and the Indiana Supreme Court in Bandidos and Brewington have all discussed the actual malice standard. It is a subjective state of mind of the speaker standard. It focuses on the speaker. It requires a showing that a statement was made with knowledge of falsity or reckless disregard for whether the statement was false or not. Can we reverse the denial of summary judgment at this stage? Yes, Your Honor. The Seventh Circuit is one of the circuits that will reverse for legal error in the denial of summary judgment. The Empress Casino case, which is cited in our opening brief for standard of review on jury instruction, speaks to that issue. These cases all discuss the actual malice standard as a subjective state of mind standard. It cannot be shown with objective evidence, and it cannot be shown based on the knowledge of a third party. Dr. Mimms advocated for imputation in response to CVS's second motion to reconsider the summary judgment, and he did so despite the fact that it conflicts with Indiana law, and he cited no authority to get the Court to impute knowledge on this burden, which was his. The Court followed Dr. Mimms' argument and imputed knowledge of a corporate representative in Rhode Island to four speakers in Indiana. The District Court expressly stated that she was doing so. In her opinion on the denial of summary judgment on the second motion to reconsider, she states, the Court declines to reject Dr. Mimms' corporate imputation argument, and then she denied summary judgment. And that cite is from the short appendix, page 67. I do not know what Dr. Mimms' lawyer will argue here, but in his appellee brief, he did not defend the imputation argument. He cited no cases in support of imputation, and, in fact, he argued she did not impute, except the quote that I've just read to you shows that she did impute knowledge. There was no other relevant evidence of actual malice, and that is the legal error from the imputation is what resulted in the denial of summary judgment. There are four statements for which summary judgment was denied. For three of those statements, there was no evidence of those speakers' subjective state of mind. For one statement, the statement… I would appreciate talking about some of the jury issues. All right. If you would, for instance, I have been wondering what would be the relevance of any evidence of a DEA investigation of Dr. Mimms that postdated the defamatory statements. Certainly, Judge Rovner. The DEA investigation evidence is relevant to the statement that Dr. Mimms was under DEA investigation. That statement was made in around sometime in 2014. But the evidence that was excluded on the DEA investigation was sort of three pieces of evidence which CVS offered to show that there was indeed a DEA investigation of Dr. Mimms that was ongoing. So the evidence that you asked about, the 2016 evidence, which is when Dr. Mimms' office was raided by two DEA agents and three undercover officers, showed that the DEA investigation was ongoing into 2016. We also offered and were not allowed to introduce evidence that the DEA investigation started before 2014, sometime around 2012. We had stipulated testimony from a criminal case that a health and human services officer handed off an investigation of Dr. Mimms to the DEA after jointly interviewing a criminal defendant with the DEA officer. So that's the testimony that you sought to admit regarding the DEA beginning its investigation into Dr. Mimms in 2012? Correct, Your Honor. Madeline Kuzma is the DEA agent who received the handoff of the DEA investigation in 2012, served subpoenas on Dr. Mimms' former employer. So in 2014, Dr. Mimms had left his practice with RAI, but the DEA served two subpoenas on RAI for nine patients, all of whom were patients of Dr. Mimms. And to prove that that was an investigation into Dr. Mimms, CVS sought to introduce evidence that seven of those nine patients had either died of drug overdoses, prescription drug overdoses, or were convicted of criminal acts in connection with drug-related crimes, because we wanted to be able to refute the argument that Dr. Mimms made that the investigation could have been an investigation into the doctors who took over any of Dr. Mimms' patients when he left the practice. Obviously, if seven of those nine patients were dead or in jail, they were not being seen by doctors who continued to take over Dr. Mimms' patients. So the continuum of these three critical pieces of evidence was relevant to show that there was indeed an investigation of Dr. Mimms by the DEA that started sometime in 2012 and was continuing in 2016. The legal error of imputation at summary judgment is the sole evidence for three of the statements that was relied on when the judge denied summary judgment. Dr. Mimms argues there are two other pieces of evidence that he says is relevant evidence of actual malice, and that is the violation of a non-disparagement guideline and a failure to investigate. Dr. Mimms argued about both of these pieces of evidence to the trial court below, and the trial court rejected both as no evidence of actual malice. But more importantly, the U.S. Supreme Court and the Indiana Supreme Court have rejected these types of evidence as no evidence of actual malice. Now, you were free, were you not, to argue to the jury that the relevant CVS employees did not actually have knowledge of the results of the March 2014 telephone interview clearing Dr. Mimms? Yes, Your Honor, and the testimony was that none of those speakers had any knowledge of the investigation. But the imputation error that caused the trial court to deny summary judgment also caused the jury to enter a judgment in favor of the plaintiff. Dr. Mimms did not even call three of the four speakers at trial. He relied heavily on the imputation evidence at trial. CVS sought to exclude all of it on a motion in limine, which Dr. Mimms opposed, and the court denied. The court allowed Dr. Mimms to introduce evidence of imputation, knowledge of people who had nothing to do with the speakers, and to argue it to the jury. And Dr. Mimms did argue it to the jury. In his opening statement, he talked about the corporate review. The first witness that he called was Mr. Grimes, one of the people involved with the corporate review. And then in his closing, he argued that CVS knew that the statements were false, and CVS made the statements with actual malice. I'm so sorry. I'm so sorry to be interrupting you. But was he permitted to tell the jury that a hundred of his patients had spoken to him about these problems at CVS? He was allowed to testify that he had heard that there were other defamatory statements made at other CVS locations, which we believe was also error and should not have come in, because it has nothing to do with facts. Yeah, but what's their number on this? I do not recall if he testified about a number for alleged defamatory statements at other CVS locations. I just know there were instances of that that he testified about. The standard that is applied for defamation where the defendant is a company is respondeat superior. But because it is an actual malice protection, which is protection from the First Amendment of the U.S. Constitution and Article I, Section 9 of the Indiana Constitution, there is a requirement of showing that the speaker, the person who is responsible for the statement, made it with the requisite state of mind. Did you file a Rule 50B motion objecting after the verdict to the admission of the imputation evidence? We did not file a Rule 50B motion, but under the Fusting case, the error was preserved. So we filed a motion in limine. The order in limine denied the exclusion of corporate imputation evidence. And so under Fusting and Federal Rule of Evidence 103, because there was a ruling on that evidentiary determination before trial, it was preserved as an argument for appeal to the Seventh Circuit. The court has held that where there is substantial error at trial, as there was here from the imputation of evidence and allowing all of that evidence to come in, and the other errors, that there is a basis for reversal. I would like to speak to the failure to investigate, which is the second piece of evidence that Dr. Mims identified as some basis for upholding the summary judgment despite legal error, in addition to the violation of the nondisparagement guideline. And so the failure to investigate has also been found to be no evidence of actual malice. The New York Times case, the Supreme Court held that a failure to investigate and having information that would show a statement is false within your files is not evidence of actual malice. So does Bandidos, the Indiana Supreme Court and Bandidos. Both these cases note that a failure to investigate could be some evidence of negligence, but it is not evidence of the higher standard of actual malice, which is what had to be shown here. And turning back to the violation of nondisparagement guideline just for a moment, the Bandidos case is the Indiana Supreme Court case that says that any violation of a guideline or a policy is evidence of an extreme departure from professional standards, but it's not evidence of actual malice, which is what was required here. Other than imputation, what was the evidence that the speakers had of where they believed the statements were false or were reckless in their statements as to the truth of the statements? I'll speak first to summary judgment and then at trial. In summary judgment, for three of the four speakers, Mr. Durham, Mr. Gamm, and Ms. Flynn, there was no evidence. Nothing. Dr. Mims did not depose those speakers despite his burden and the fact that almost every defamation case involves the testimony of the person who made the statement. Dr. Mims did not depose and offer testimony from those three. At summary judgment, there was deposition testimony from Ms. Fields, who is the individual who made the statement that Dr. Mims was under DEA investigation. She testified in her deposition that she had been told by a co-worker that Dr. Mims was under DEA investigation. She had been told that before she offered that statement to the patient witness and that she didn't tell the patient witness where she had heard it, but that was the source of her knowledge. At trial, Ms. Fields' testimony was the same. There was no testimony or evidence of the subject state of mind of Mr. Durham. No demeanor, nothing. Just that he made the statement. For Mr. Gamm, the evidence was no state of mind evidence, only the potential of demeanor evidence. Demeanor evidence, to the extent it would be relevant, would be perhaps some evidence of ill will. The Indiana Supreme Court has held in Brewington that evidence of ill will alone is not enough. There needs to be something about what the person knew or believed. And then Ms. Fields, or I'm sorry, Ms. Flynn, denied making the statement and then she also said that she would have had no basis to make the statement. But the trial evidence for the speakers shows a weakness in subjective state of mind and in some statements a lack of any subjective state of mind evidence. And we believe that the imputation evidence caused the error of the jury verdict in this case. The summary judgment, if the summary judgment is upheld, Indiana defamation law will be expanded beyond that which exists now and would allow defamation to exist where one person makes a statement and somebody else in a company knows it is not true. And that would be a violation of the Constitution and the U.S. and Indiana Constitution. Briefly, the other evidentiary errors that CVS raises seeking a new trial is that CVS was not allowed to challenge the credibility of Dr. Mims by using his false interrogatory answer. He was asked if he'd ever been the subject of an investigation or inquiry and he said no, despite five instances where that had occurred. He admitted it occurred. Now, because Dr. Mims' credibility was not a central issue at trial, even if we concluded that the evidence of his incomplete, shall we say, interrogatory responses should have been allowed as evidence, how could you show the requisite prejudice? Judge Rovner, Dr. Mims was the plaintiff in a defamation case where he had no actual damages and he sought reputational damages that were presumed. In Indiana, presumed damages are to compensate a plaintiff, not punish the defendant. Here, Dr. Mims got more than a million dollars for four statements where the patient witnesses testified that they did not tell anyone other than family members. They continued to see Dr. Mims and the statements did not change their opinion of Dr. Mims. We believe that his credibility was very important for the damages award and also Dr. Mims testified that CVS had cleared him and he testified that CVS apologized for what was happening and said it was an error. CVS witnesses testified that neither of those things happened, so we believe for all of those reasons his credibility was very important to the outcome of this case. Did the court offer to instruct the jury before they began deliberating that they were not to consider damages? Why did you reject its offer? With regard to the attorney's fee issue, Your Honor? At the time that that issue came up, we did not understand that the jury was focused on that issue. When the supplemental jury question came and it was clear that the jury had been affected by Dr. Mims' lawyer asking him about attorney's fees, we then asked that the supplemental instruction be given that the issue was not before the jury and the Schmitz case is a case where that exact instruction was affirmed as appropriate. But given that there was no evidence relating to legal fees, wasn't that an appropriate way to handle the question? You know, the supplemental instruction that reminded them that they had all the evidence before them and they should consider only the evidence presented at trial? Your Honor, we believe that the question interposed a new legal issue for which there was no instruction and that the jury needed to be instructed that that issue was not before them. Well, she did. She reread, as I recall, she reread the pertinent instructions. She reminded the jurors that the attorney's questions, one of which related to legal fees, were not evidence. What more do you think she could have done? We believe the appropriate instruction would have been attorney's fees are not an issue before you because this issue falls not in a question of them needing to be reminded about the evidence nor in them needing to be reminded of the instructions  So it is our position that when a jury has confusion about a legal issue, they need to be instructed that that issue is not before them. How did the issue come up in the first place? Was it an argument of counsel? Was it a question? How did it actually get into the record? I see I'm out of time, but I'd like to answer your question. Go right ahead. Thank you. The issue came up because Dr. Mims's lawyer asked Dr. Mims what his attorney's fees were when he was on the stand. And there's no question attorney's fees are not an element of damages and defamation. So we believe that the counsel brought the issue up and infected the jury by raising that issue. Thank you. Thank you. Mr. Babb. Okay. Opposing counsel, may it please the court. Your Honor, if I could, I'd like to, before I get into my argument, I'd like to address some things that were said here just briefly. This corporate imputation issue, I'll explain it in a minute because it's really not what, the evidence before the court wasn't that they were trying to take what was in somebody's corporate mind and impute it to a lower ground level employee who was a speaker. It's different than that. There's a clear bridge between corporate and the ground level speakers, and I'll get to that in a minute. With respect to the D- Wait, wait. I'd like you to get to it now. Okay, Your Honor. I mean, are you able to point to any case law that permits one to impute knowledge of a principle to an agent instead of the other way around? Your Honor. I'm getting an inference that a CVS pharmacy tech knew information based on what the corporate parent knew is backwards. Well, Your Honor, that's not what the evidence was, and that's not what our theory was. What happened was is that- It may not have been your theory, but it sure looks like that's what happened. Your Honor, it's not. So what we had was we had Mr. Zweig, who was above the pharmacy supervisors. Dr. Mims went to Mr. Zweig and said, Your pharmacy technicians and pharmacists are repeatedly defaming me. And so what Zweig did is Zweig sent an email back down to his pharmacies, one of which was where the McIntosh pill statement was made. So after he sent this communication back down to those pharmacies and he said, Follow this corresponding responsibility doc directive, which basically says that you have the independent right not to fill a prescription, but when you do so, do not say the following statements, that he runs a pill mill, that he is under DEA investigation, that he's about to be arrested, that he went to jail. And so there is a connection. And that's circumstantial evidence. Is it direct evidence? Do we have direct evidence that somebody from corporate told the individual pharmacies on the ground to stop defaming him? No. But what we do have is undeniable evidence that they went back down and said, Look, this guy is complaining about you defaming him. Follow the corporate doctrine. And if you're going to refuse to fill, don't say these things. Did he say that Dr. Mims, did he say to the pharmacist that Dr. Mims said you're defaming him? I thought he simply sent down a directive saying follow these rules. He did, Your Honor. But did he actually say that Dr. Mims says you, these individual pharmacists, are defaming him? No, but what they did, but if we have a situation where you have your supervisor going back down and saying we have this policy, this policy says, and by the way, Mims was complaining to these pharmacies, too, that they were refusing to fill his prescription. There was no evidence of the four speakers that they got a complaint from Dr. Mims, was there? Well, Your Honor, in this particular situation, I believe he certainly complained to corporate that they were not. That's not my question. Did he complain to the four speakers? Because those are the critical people in a defamation case. They are, Your Honor, but here's something that's important. Like we said in the brief, there is no direct evidence that we have here. This is all circumstantial evidence. This is a difficult case. And so what we have is, and I think it's important to talk about what the evidence was, point by statement by statement of summary judgment first. So we have the Mason DEA statement. That's from Kim Fields. Judge Rovner, did you have a question? I do. I really need to get to this. I need to know what the basis is for your suggestion that the CVS policy instructing its employees not to suggest that a doctor was under investigation or facing arrest creates some kind of unique and compelling evidence of the employee's state of mind? Oh, boy. Because to me, if anything, the existence of the policy would suggest that the employees would not have said anything about Dr. Mims unless they believed it to be true. Well, Your Honor, so what we have is we have at the summary judgment statement, we have this policy that tells these individuals do not make these statements. And then we have these. Those statements particularly? Yes, Your Honor. At the summary judgment? That's correct, Your Honor. Those precise statements. They have a corporate policy that says under no circumstances are you to make any disparaging comments. Well, I understand the general prohibition, but the specific ones you're talking about. Yes, Your Honor. It goes on. The specific statements, that's what makes this case so unique. And Judge Rodenberg, so then there's your point. So we have this policy out there that if I'm on the ground and I'm interacting with customers, if I'm going to refuse to fill, don't say A, B, C, and D. We also had evidence at summary judgment that every one of these employees was trained on this policy and that they knew that these were serious statements and they had to be founded in truth. Okay. Did the CPS policy permit the enumerated statements to be made if the employee was certain they were true or were they forbidden under any circumstances? They were forbidden under any circumstances. So, Your Honor, just as a matter of common sense, if you are told not to say something, don't say something, then that, as a matter of common sense, if you're told not to say that and you don't have any basis whatsoever, which was also an argument at summary judgment, there's no basis out there. There's no factual basis that anybody could point to that any of these statements are true. And I'll go to the DEA investigation in a minute. All right. Well, you know, you may have proven that the CVS employees spoke with reckless disregard as to their internal policy, but that would not be the same thing as reckless disregard for the truth, would it? I think it would, Your Honor. It's important to understand that Indiana law is clear to demonstrate reckless disregard. There must be sufficient evidence to permit the conclusion that somebody entertained doubts or you acted with reckless disregard. So an evidentiary base to permit the conclusion that that goes forward. And then we also know that reckless disregard, and this is what the Banditos Court said, cannot be fully encompassed in one infallible definition. And so we have a unique policy here that tells all of these folks, do not say this. We know there was evidence that they were trained on this policy. There was evidence that, and again, it's circumstantial. It's not direct evidence from these speakers, but it's circumstantial evidence that these were serious statements and they had to be founded in truth. So in order for you to say something that is forbidden, specifically, you should have a basis for saying it. And if you don't, then that would be an evidentiary basis to permit the inference that you said it with reckless disregard for whether it was true or not. But you see, I fear that you're seemingly suggesting that the fact that CVS had a policy about what employees could say somehow lowers the standard for actual malice. I don't, Your Honor. So again, reckless disregard can't be encompassed in one infallible definition. So here's how I understood it. And here's what I believe the law requires. If you're just walking down the street and you blurt out something that you have no basis in fact to say, there's no reason why you would say it. And you just recklessly say, for example, that somebody on the court is throwing wild inappropriate parties. You guys are public figures. Your circuit court judge is in the Seventh Circuit. So somebody just says, these guys are doing this. Then the question becomes, in a normal case, would a reasonable person have said that? That was completely false, but were they required to investigate it before saying it? Now, that's an objective standard. A reasonable person's standard in a normal case won't apply to help you establish actual malice because it says nothing about the subjective mind. In this particular case, these folks were trained on this policy. They knew that it required truthful statements. They had to be founded in truth. How can that not be sufficient evidentiary basis to permit the inference or the conclusion that they knew when they said these things that they were false? Kim Fields, Your Honor, read Kim Fields' testimony at summary judgment. She literally says, I just threw it out there. I didn't know whether it was true or not. I just threw it out there. And at trial, she confirmed that she was completely speculating about it. She'd been told by another CVS employee that he was under investigation. That's true, Your Honor. That's the one thing that would maybe seemingly support that she had an excuse, but then she also said, I was completely speculating about it. So that is a question of fact for the jury to decide. Now, how could you have proven, for instance, that the pharmacy technician who spoke to Tony had serious doubts about the truth of what he said when you were unable to either identify the technician or call him as a witch? Well, first of all, Your Honor, that's a great question. Very quickly, we talked about nobody being deposed at summary judgment. Garman was dead. Tony Garman was dead, so he would have been difficult to depose. Also, CVS didn't identify any of the speakers until the night before summary judgment, so that's why they weren't deposed. Now, you ask a very good question, and here's the thing that I think we struggle with, and I struggle with it too. I mean, yes, I want to win, but I want to do it under the rules of law. So then the question becomes, what happens when you have actual malice that applies and you have somebody that comes in and says, that person said something that was completely false and had no basis to say it, and then they come back and say, you know what, I didn't say it? That's the dilemma that we have, because then we have a situation where I agree it does get difficult to prove the subjective state of their mind if from the beginning they're completely denying it. But again, this is under Indiana law, and I believe that for the same reason, and the Banditos case touches on this in footnote 27 of Justice Sullivan's opinion. Testimony by a defendant that he or she published in good faith or believed the publication to be true is not sufficient to dispel the notion that the defendant acted with actual malice. I think when the shoe's on the other foot, when you come and do we really want a public policy that would allow people to defame public figures and claim and just say, I didn't say it, and then that's the end of it? I don't think. You have to have something else unique. You have to have some other evidentiary basis that would allow the case to go forward. And here, Judge Kaney, I agree it's odd. These specific statements were specifically disallowed by this corporate policy. Don't say them. I have twin 10-year-old boys. If I told my twin 10-year-old boys, don't say A, B, C, or D, they would know not to say it. And by the way, I also told them because those are disparaging. They're defamatory. Don't say them. And then if they said them, one of them will probably say, why did you say it? Well, because I know it was true. So you have to have some basis, some basis on why you said that. And here's another problem that you have when you get to trial. There was a culture of sharing information at CVS. And so what you had was you had a situation where, in fact, it was even on page on Exhibit 2077, which is this policy that says don't make these statements. There was testimony at trial about the fact that the pharmacies shared information. And you had a situation where it was Mr. Grimes' testimony on page 152. He got an email from an interim pharmacy supervisor that someone has told a CVS pharmacist that the DEA is investigating the doctor, but I-slash-we have no actual knowledge of this. And so here's what happened. Okay. You had the DEA that was coming in, and you had these high prescribers of these medicines. So the DEA was inconveniencing these lower-level pharmacies. These guys were trying to do their job. They were also dealing with the DEA. The DEA was coming in and investigating them. You also had Dr. Mims' patients who were coming in, and they were coming in too early on their prescriptions, and they were annoying these folks. And this all goes to this ill will, which is undeniably a part of this case. How does ill will relate to defamation? You are more likely to say something recklessly false that's just not true with no basis when you don't like somebody, when you're annoyed at somebody. And so CVS pharmacies were dealing with these DEA investigations. His patients kept coming back and trying to get prescriptions filled. In fact, if you read the testimony of Flynn about the Petro jail statement, you'll see. She's like, you know, we knew Petro. Of course, she would come back in every two or three weeks, and we'd have to tell her you're back here too early. And so what happened was is that they didn't like Dr. Mims. There was this ill will out there for him. You had this policy of sharing information, a culture of that. They knew that the DEA investigations were coming there. There's no evidence, or at least it's a factual issue about whether he was ever being investigated by the DEA. Why did you put in evidence? I assume it was you that put in evidence that the corporate investigation had cleared him when none of the speakers were aware of it. Why did you put that in? Your Honor, I would acknowledge that the mere fact of that corporate investigation without any bridge to it going back down to a subjective state of mind of a speaker isn't very helpful. It has no relevance. It doesn't, Your Honor. Well, Your Honor, I think that it was a trial theory, but that wasn't all that was there. You argued it, though, didn't you? I did not, Your Honor. No, the plaintiffs argued it. But that's not all they argued, though, Your Honor. What they said was is that during this investigation, and whether the investigation of Mims was generated by the ground-level pharmacy employees or, as Dr. Mims thought, in response to the fact that he was complaining to them about being defamed, there was a communication back down from corporate. And if you read the Harmon case, what Harmon talks about is— The communication, though, was not that Dr. Mims had been cleared in a corporate investigation, although Dr. Mims testified to that, didn't he? He told the jury, I'd been cleared by corporate, and yet all these pharmacists are saying bad things about me. But you had this higher-level corporate person going back down and saying, follow—I'm going to remind you guys again, we have the policy there for a reason. If you're going to exercise your independent judgment, don't say these things. Now, here's what's key to that. Again, that's the McIntosh pill statement. But also, that email was sent back down to the Greenville Pharmacy for the McIntosh pill statement in June of 2014, and then you had this Doyle Blanton arrested statement coming in in 2015. So it didn't work. So you have corporate, you have individuals on the ground that are annoyed at Dr. Mims. You have a corporate that really doesn't care that much about it, right? I mean, here's one of your doctors, one of your partnered health care physicians, coming in and saying, your independent pharmacies are refusing to fill my prescriptions, but they're also telling my clients all this terrible stuff. And remember, Your Honor, this didn't start out as four statements. This started out as a bunch of statements that were eventually whittled down. And at the end of the day, on summary judgment, you had this policy, this very unique policy. But it was whittled down from nine statements to four. It was. What was the principle at summary judgment? What was the difference between the five that the judge dismissed on summary judgment, granted summary judgment, and the four where she denied it? I think the difference was this, Your Honor, and it goes to Judge Roedner's question. One issue that this court does not have because CVS is not arguing it is speakers were unidentified. Well, you can't bring a claim against a speaker that's basically saying, I didn't do it. I didn't say it. Well, that issue, I believe some of the folks that were called out on summary judgment, if you look at one of the earlier orders, CVS had acknowledged that the four statements that were going forward to trial, they were identified with sufficient clarity. In other words, the speakers, the individuals that were saying that those statements were made, they knew enough about when they were said, on what occasion they were said, and at what time, so that those matters went to trial. But that still becomes, it's a good question, Judge Roedner, so at the end of the day, if somebody denies making a statement, how can you possibly get to what their subjective state of mind is? And the answer to that question is, I can't imagine that we want to have a policy in this circuit that would say that you can severely defame somebody so often that it's difficult to identify who the speakers are, and then they can just come in and say, I didn't say it, and then basically you're left helpless. You have to have something else, something unique. And so the corporate imputation, this case was not tried under corporate imputation. All of that evidence was circumstantial evidence. It's the circumstances of what went on. That's the way the jury was instructed. That's the way that the judge viewed it. And again, I agree, corporate-level review with no connection whatsoever down below, but that's not what it was. There was at least, with respect to the one statement, right back down to that pharmacy that said, you know what, that doctrine that says that you can't be saying these statements, follow it. And what happened a couple weeks later was they violated it again. And then you had the Doyle Blanton arrested statement coming in after that. And again, regardless of any corporate imputation theory, okay, Fields is an undeniable material issue of fact on whether she had any basis to say that the DA statement, that he was under DA investigation. And then when it went to trial, there was also an issue. She said she acknowledged that she was speculating about the statement. So you have on the one hand information that, okay, somebody had told her that he was under investigation. And again, that's not surprising to me. That was one of Ms. Moerkel's theories at opening. And the reason why they did that, they wanted to make this point to the jury that everybody talked at CVS. So all of these DA officers were coming in there, but they just weren't, there was no evidence that they were investigating them specifically, which is the whole point of that DP trial transcript. They pull out a quote from that. If you read before and after that quote in their brief, right, on that transcript, at the end of the day, that investigation, what I should have said is that there was, the transcript doesn't establish that there was a legitimate investigation of Mims that was passed on the DA. There was an investigation, but they didn't believe that guy. And so they said right beforehand, we're not investigating him because we don't believe this individual, this DP, he lacks all credibility. I thought Agent White said he was investigating Dr. Mims. Your Honor, the quote right before it that they don't put on there, they asked him. In fact, here I have it right here. Officer White, as a result of the involvement in this case, was there any further investigation where Dr. Mims was concerned? After Mr. DP did not cooperate from my end, no substantial investigation of Dr. Mims. So I think is that when the judge saw that, there was all this inflammatory testimony in there about Mims taking cards in exchange for prescriptions, and then if you go after this, you have this guy saying, and we didn't follow up on our investigation of this guy because he was completely, lacked all credibility. Doesn't CVS get, it's really your burden to prove the falsity of the statement. Doesn't CVS at least get a chance to prove the truth of the statement? They do, Your Honor, and there was evidence on both sides and the jury didn't believe them. But they didn't get to put in the evidence, the stipulated evidence you had from the agent. Your Honor, that transcript, the reason why the trial judge didn't allow it, it was literally a bucket full of hearsay. That was all complete hearsay. Now, and we say this in our brief, there was... You're saying that what made the DP transcript totally lacking in credibility was that it was all hearsay? No, Your Honor. What I'm saying is that the district court was within her discretion to not admit a document that was in violation of the hearsay rule. But also, apart from that, it did not establish that there was a legitimate investigation of Dr. Mims. Yes, they passed on something to the DEA, but if you read it, it wasn't really a legitimate investigation of Mims because the guy that was the subject of the investigation, this criminal, lacked all credibility. And so at the end of the day, and it's important because this is not a judge that excluded all evidence of the DEA investigations. There's all sorts of evidence that CVS was able to get before this jury to try to make the argument that he was under investigation by the DEA. They just didn't believe him. Thank you, Counsel. Thanks, Your Honor. I'll give you another minute to respond. Two minutes. Thank you. I'd like to address a few of the issues that came up and clarify the record. The policy, the non-disparagement policy, is a general policy that applies whether a speaker believes a statement is true or not. The founded in truth phrase that you've heard Counsel use multiple times was the testimony of one witness who was not one of the speakers. So one person said that he thought that a statement needed to be founded in truth. That has nothing to do with the subjective state of mind of the speaker or what the policy applies to. Ms. Fields' testimony at trial that was described as being speculative was that she was not sure if the reason Dr. Mims's office had closed. So a patient came to her and said, I'm concerned. I don't know where Dr. Mims is. His office is closed without notice. Ms. Fields said, perhaps it's because he's under DEA investigation. She testified she believed that Dr. Mims was under DEA investigation. She just didn't know if that was the reason his office was closed. There is no evidence that Speaker Mr. Gamm is dead. I do not think Mr. Gamm is dead. I don't know why Counsel would say that. The speaker- Why don't you think he's dead? Based on the research that I did on the- You're not correct, or you aren't, I think. I'm sorry. Based on my internet research, I do not believe that Mr. Gamm is dead. Mr. Gamm, and there's no testimony about him being dead. Mr. Gamm was fired from CVS, but there was no testimony or no reason to believe that he's dead. And the reason this defamation case exists is plaintiff has four patients who came to him and said, these CVS witnesses defamed me. The idea that he would not be able to find the witnesses, have his patients go to the CVS store and identify the speakers, is surprising to me. The difference of the treatment of the five statements and the four is not because a speaker was identified or not. One of the statements that went to trial went to trial with the witness identifying the speaker as a Ryan or an Eric or a Drew. One of the statements where summary judgment was granted, the Miller cases, the speaker was identified by name. That is not a basis for why some statements went and others did not. And finally, there's no such thing as ill will of CVS. The ill will evidence would need to be tied to the speaker, and ill will alone is not enough. There still needs to be something that ties to the state of mind of the speakers. Thank you. Thank you, counsel. Thanks to both counsel and the cases taken under advisement.